# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DENNIS GARY WHITTIE,

               Plaintiff,

v.

                                                 CIVIL CASE NO. 05-74887

CITY OF HAMTRAMCK, LOUIS H.             HON. MARIANNE O. BATTANI
SCHIMMEL, JAMES DOYLE,
DONALD CRAWFORD, ROBERT CEDAR,
and SCOTT KLEIN,

               Defendants.

_____/

## OPINION AND ORDER

## I.     INTRODUCTION

Before the Court is Defendants' Motion for Summary Judgment (Doc. #32). Plaintiff

sued Defendants for violating his federal and state constitutional rights, the Michigan

Whistleblower Protection Act, and the Michigan Bullard-Plawecki Employee Right-To-Know

Act. Plaintiff also alleges defendants Doyle, Cedar, and Klein made defamatory statements

about him. Defendants seek summary judgment, contending that they are entitled to qualified

immunity, absolute immunity, and that Plaintiff's claims lack factual support. In a June 20,

2007, Order, Plaintiff's Whistleblower Protection Act, and the Michigan Bullard-Plawecki

Employee Right-To-Know Act claims were dismissed in their entirety, as well as Plaintiff's

Retaliation claim against the City of Hamtramck and defendant Schimmel. Plaintiff's

Defamation Claim against defendant Cedar was also partially dismissed. Defendants' Motion

for Summary Judgment on Plaintiff's Defamation claim against defendants Doyle and Klein was

denied. The only remaining unresolved issue is Crawford and Doyle's claim to qualified immunity for Plaintiff's First Amendment claim, which the Court will now address.

## II.    STATEMENT OF FACTS

Plaintiff began his employment with the City of Hamtramck (the "City") as a police officer in 2001. At the time Plaintiff was hired, he received a copy of the Department's Rules and Regulations. He acknowledged receipt of those Rules and Regulations. He received positive reviews and passed his probation in 2002.

In March and April of 2003, Plaintiff sent letters to the City's Council, the Michigan Attorney General's Office, the Wayne County Prosecutor's Office, and the Michigan Department of Treasury because the Public Safety Director Melvin Turner held posts with the City and the City of Highland Park in violation of the Michigan Incompatible Offices Act.[1]

Starting in April 2003, Plaintiff maintained an unofficial web-site called "Inside Hamtramck." The web-site provided information with respect to various issues in the City. In July 2003, the Plaintiff uncovered information that Steve Shaya, the City's head building official, was a convicted felon and was employed in contravention of the City's Charter. Plaintiff posted this information on his website. Per his supervisor's direction, this matter was not to be handled as an official police matter. Instead, his supervisor told Plaintiff to prepare a report of the Charter violation regarding Shaya as well as of other questionable actions taken by Shaya. He then disseminated the Shaya Report to various parties including, Louis H. Schimmel, - the City's Emergency Financial Manager, the City's Council, the Michigan Department of Treasury, and certain Michigan legislators.

---

[1] Turner subsequently resigned from one of the positions.

2

After issuing the Shaya Report, Plaintiff was subjected to discipline. On July 22, 2003, he was reprimanded for damage to a police vehicle even though the official report cleared him of engaging in any hazardous action. On July 23, 2003, he was reprimanded by Turner for his actions with respect to the Shaya Report even though an internal investigation cleared him of any wrongdoing. On August 7, 2003, he was ordered to remove any City documents from his web-site even though he received these documents from the City via the Michigan Freedom of Information Act.

On September 23, 2003, he was suspended purportedly because he posted on his web-site a public document he received from the City. On October 3, 2003, he was terminated, because he allegedly violated a direct order not to reveal any information about the disciplinary hearing leading to his suspension.

On October 15, 2003, Plaintiff filed his first lawsuit in this Court. That lawsuit brought claims against the City, Schimmel, Doyle, and Turner for violating Plaintiff's rights under the First Amendment, the Michigan Whistleblowers' Protection Act ("WPA"), and comparable Michigan constitutional provisions.

On July 19, 2004, an arbitrator denied in part and sustained in part Plaintiff's grievance regarding his suspension, letting the penalty stand and finding no violation of Plaintiff's First Amendment rights. On January 13, 2005, an arbitrator granted in part and denied in part Plaintiff's grievance regarding his termination. He reinstated Plaintiff without back pay or benefits, but without loss of seniority.

In the Summer of 2005, and while on duty as a City police officer, Plaintiff helped deliver a baby in the backseat of a car. Without explicit permission from Police Chief Doyle or

Department supervisors, Plaintiff was interviewed by both the Detroit Free Press and on camera by a news reporter from a local television station. The Detroit Free Press published a story and the local television station broadcast a story about the event. Doyle praised Plaintiff for the coverage.

On June 22, 2005, this Court issued an "Opinion and Order Granting In Part And Denying In Part The Parties' Cross Motions For Summary Judgment" in the first lawsuit. The Court found Plaintiff's email to be protected where it addressed a matter of public concern. The Court otherwise held there were questions of fact precluding summary judgment. Defendants Louis Schimmel and Melvin Turner appealed this Court's ruling that they were not entitled to qualified immunity on September 7, 2005.

On September 18, 2005, Plaintiff was involved in an arrest of a suspect for Operating While Intoxicated 3rd, Resist/Obstruct a Police Officer, Driving on an Expired Driver's License, and Leaving the Scene of an Accident. During the struggle, the suspect actively resisted arrest. Several neighbors came and asked if Plaintiff was alright. Plaintiff told them to stay back. According to his police report, Plaintiff observed a suspect that he believed to be involved in an attempted theft of a vehicle. The police report goes into great detail about Plaintiff's struggle in apprehending the suspect, which included Plaintiff's use of his baton. On this particular issue, Plaintiff set forth in his police report as follows:

> While my backup was racing to me during the struggle, several residents came
> out of their backyards and into the alley to see what the commotion was. After
> observing that I was a police officer and was fighting to take a suspect into
> custody, several resident gentlemen were asking if I wanted their help. I yelled

out for people to stay away; this was so no one would be hurt.  However, I want
to express my deep appreciation for the generous offer of help.

Defs.' Ex. J, Police Report.

On September 28, 2005, the local newspaper known as "The Citizen" published a letter

to the editor authored by Plaintiff concerning the September 18, 2005, incident entitled, "Police

officer says thanks to those who offered help."  In the article, Plaintiff goes into great detail

about his arrest, including a reiteration of some of the facts set forth in the police report.  He also

makes specific reference to a "knockdown/dragged-out fight" and how his fellow police officers

were "racing to me during the struggle" and refers to the suspect as a drunk driver.[2]  He closes

the letter by thanking the witnesses for relaying a call for help, and cooperating with the

investigation. Plaintiff signed this article as a Hamtramck police officer.

At about the same time that Plaintiff sent his article to The Citizen, the Police

Department issued its weekly crime log.  The crime log described the incident with much less

detail: "After a man was involved in a crash at Yemins and Lumpkin Streets, officers arrested

him for drunk driving."  Defs.' Ex. L.

On September 30, 2005, the City received a letter from Lexington Insurance Company

confirming that it would provide no coverage against Plaintiff's claims in the first lawsuit.

Following publication of Plaintiff's letter in The Citizen, Chief Doyle became aware of

the subject article, either by reading the paper or through a fellow police officer.  Upon his

review of Plaintiff's article, Doyle, together with his superior officers, became very concerned

about what they read.  Doyle testified that putting a diluted version of his police report into a

---

[2] The suspect Plaintiff arrested during the incident on September 18, 2005, did not  plead
guilty until October 13, 2005.

newspaper article was totally inappropriate because there was an ongoing investigation at the time.  Dep. of Doyle, at 88.  He was also concerned because Plaintiff had a potential to be called as a witness in the case and believes that Plaintiff should not have put this information in the newspaper, and should not have made reference to a "knock- down/drag out fight" because the Police Department does not want to sensationalize the fact that it has to occasionally use force.  Id.  He also believes that Plaintiff should not have referred to the criminal suspect as a drunk driver because the suspect's status had not yet been adjudicated.  Id., at 89.  In addition, Doyle was critical of Plaintiff's statement that his backup was racing to him because officers are supposed to respond professionally within the statutory guidelines when going to the scene, and not race recklessly through the streets of the City.  Id., at 90.  Lastly, Doyle was critical of Plaintiff's comments about not wanting the help of citizens because the Police Department does not want criminals to believe that citizens cannot come to the aid of a police officer who needs such aid.  Id., at 91.

    As a result of these concerns, Chief Doyle instructed Lt. Serafino to conduct an investigation of Plaintiff's apparent violation of department rules.  As part of the investigation, Lt. Serafino sent correspondence to Plaintiff on October 4, 2005, to inquire as to whether Plaintiff authored the subject article and whether he had prior approval from Chief Doyle.  In response to the written inquiry, Plaintiff indicated, "Yes," to both questions.  In addition, Plaintiff, as part of his response, made reference to a September 14, 2005, correspondence prepared by fellow officer, Dave Donnell.

    When Chief Doyle reviewed Plaintiff's response, he was puzzled as to Plaintiff's statement that he had given the Plaintiff prior approval to send the subject article to the local

newspaper.  In order to complete the investigation, Chief Doyle approached Plaintiff and inquired as to the alleged authority that had been provided.  In response, Plaintiff indicated that Chief Doyle gave blanket authority to write such letters in a deposition over a year earlier.  Chief Doyle, unsatisfied with this response, instructed Lt. Serafino to issue charges against Plaintiff for violation of the Department's media relations policy, as well as of Sections 29 and 31 of the Department's Rules and Regulations.

On October 18, 2005, Doyle conducted a hearing with respect to the charges against Plaintiff.  During the hearing, it was noted that another officer had written a letter to the editor concerning department business that was published in "The Citizen" on September 14, 2005, without Doyle giving any permission or issuing discipline.  Doyle referred to Plaintiff during the hearing as "wonder boy," and "super cop."  He also commented that Plaintiff had an insatiable need to be in the media.  After the hearing on October 18, 2005, Plaintiff was once again terminated.  Plaintiff filed the instant suit on December 27, 2005.

After the termination, the union filed a grievance.  Arbitration was held on the grievance before Arbitrator Mario Chiesa, who in an opinion dated October 23, 2006, denied the grievance and upheld the City's termination of Plaintiff's employment.

On April 2, 2007, the Sixth Circuit Court of Appeals dismissed Schimmel's and Doyle's appeal of this Court's qualified immunity ruling in the first suit for lack of jurisdiction.

## III.    STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

As the United States Supreme Court has ruled:

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. See Hager v. Pike County Bd. of Educ., 286 F.3d 366, 370 (6th Cir. 2002). "[T]he burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party carries that burden, the burden then shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. FED. R. CIV. P. 56(e); Chao v. Hall Holding Co., 285 F.3d 415, 424 (6th Cir. 2002). "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 256 (1986). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. See Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Sagan v. U.S., 342 F.3d 493, 497 (6th Cir. 2003).

"A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate

principle[s] of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984)(citation omitted)(quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)). To create a genuine issue of material fact, the nonmovant must do more than present some evidence on a disputed issue.

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Anderson, 477 U.S. at 249-50. "No genuine issue of material fact exists when the 'record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" Mich. Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 534 (6th Cir. 2002)(quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). However, the mere existence of a scintilla of evidence in support of the non-movant is not sufficient; there must be sufficient evidence upon which a jury could reasonably find for the non-movant. Anderson, 477 U.S. at 252.

## IV.   ANALYSIS

### A.   Analytical Framework

Crawford and Doyle ("Defendants") contend that the Court should grant them summary judgment on Plaintiff's First Amendment retaliation claim because they are entitled to qualified immunity. Qualified immunity is an affirmative defense that shields government officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "The entitlement is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."

Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  The United States Supreme Court has set forth a two-prong test to determine whether a defendant is entitled to qualified immunity.  Saucier v. Katz, 533 U.S. 194, 200 (2001).  The first prong requires the reviewing court to inquire whether the facts, viewed in the light most favorable to the plaintiff, show the official's "conduct violated a constitutional right."  Id. at 201.  The court must "concentrate at the outset on the definition of the constitutional right and [then] determine whether on the facts alleged, a constitutional violation could be found."  Id. 207.

If a constitutional violation could be found, the second prong requires the court to decide whether a reasonable official would, at the time the act was committed, understand that his conduct violated that right.  Id. at 201.  A government official will be entitled to immunity as long as the conduct does not amount to a violation of a clearly established right of which a reasonable person would have known.  Harlow, 457 U.S. at 818.  A right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation that he confronted."  Saucier, 533 U.S. at 202.

Defendants contend that they are entitled to qualified immunity because they have not violated Whittie's constitutional rights.  Defendants assert that Plaintiff's speech is not protected by the First Amendment because it is not a matter of public concern as it did not relate to matters of political, social, or other concerns to the community, and it was not of general value and concern to the public at the time of its publication.  Defendants go on to argue that even if it were protected speech, the Pickering balancing test weighs significantly in their favor because the statements in Plaintiff's letter were contrary to Police Department policies, and have the potential of interfering with the judicial process with respect to the identified defendant and

provided inappropriate and inaccurate information to the public with respect to Police Department policies.

Plaintiff, on the other hand, argues that he engaged in constitutionally protected speech on matters of a public concern, and maintains that the Sixth Circuit has made it abundantly clear that qualified immunity is to be denied to public officials in First Amendment retaliation cases because the right to be free from retaliation for exercising those rights is clearly established. He alleges that he was determinated not only because of his September 28, 2005, letter to "The Citizen," but also because of his speech and speech-related activities in 2003. He contends that this Court has already found that his 2003 speech was protected. Moreover, he asserts that the 2005 letter to the editor was speech on a matter of public concern as the letter served important educational purposes by informing readers of the need for officers to keep bystanders safe, consistent with officers' duties as outlined in the City's Rules and Regulations.

Plaintiff also argues that Defendants cannot meet their burden of showing that the employer's interests outweighed his right to free speech. He contends that Defendants' asserted interests in punishing his speech are pretextual. He contends that people are aware that police officers must use force at times and must drive at speeds in excess of the posted speed limit at times to perform their duties. Additionally, he argues that Defendants' position that the letter could have prejudiced the prosecution is not reasonable because it is based on imaginary concerns. He maintains that it is absurd to think that a letter published in a local paper like "The Citizen" could taint the entire jury pool for Wayne County, particularly where the defendant was not named. He also asserts that Defendants' argument about prejudice to the criminal defendant is pretextual, because the City has no general concern about such prejudice. To support this

allegation, he cites the case of Officer Ron Dupuis. According to Plaintiff, on November 11 and 12, 2005, information about Dupuis' suspension for alleged criminal behavior was disseminated to local television channels 2, 4, and 7 at Doyle's behest. Moreover, he asserts that the Department has routinely released sensitive information to the media in its crime log for years, including names of criminal defendants, descriptions of crimes, names of rape victims, and names of those committed due to mental illness.

**B.    Application of the Saucier Test**

**1.    Underlying Constitutional Violation**

In order to prevail on his First Amendment retaliation claim, Whittie must demonstrate "1) he engaged in protected conduct; 2) he suffered an adverse action which would deter a person of ordinary firmness from continuing to engage in the protected conduct; and 3) the adverse action was motivated at least in part by the protected conduct." Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999). See also Leary v. Daeschner, 349 F.3d 888 (6th Cir. 2003).

To show the speech at issue is constitutionally protected under the first step of this framework, Whittie must satisfy two additional standards as a public employee. First, Whittie must demonstrate that his speech implicated a matter of public interest or concern. Generally, it is appropriate to find that speech implicates a matter of public concern when it informs the community that a government entity has failed to discharge its governmental responsibilities or has engaged "actual or potential wrongdoing or breach of public trust." Connick v. Myers, 461 U.S. 138, 148 (1983). However, when the proffered speech addresses a matter of personal interest, i.e., when it involves "internal personnel disputes or complaints about an employer's

performance," it falls outside of the scope of First Amendment protection. <u>Brandenburg v. Hous. Auth. of Irvine</u>, 253 F.3d 891, 898 (6th Cir. 2001) (quotation omitted).

Second, Whittie must prove that his interest in taking up the matter of public concern outweighs Defendants' interests, as employers, "in promoting the efficiency of the public services it performs through its employees." <u>Pickering v. Bd. of Educ. of Township High Sch. Dist.</u>, 205, 391 U.S. 563, 568 (1968). "Whether speech addresses a matter of public concern is a question of law." <u>Banks v. Wolfe County Bd. Of Educ.</u>, 330 F.3d 88, 892 (6th Cir.2003). <u>Cockrel v. Shelby County Sch. Dist</u>, 270 F.3d 1036, 1048 (6th Cir. 2001).

If Whittie is able to establish a prima facie case of retaliation, "the burden of persuasion shifts to the [defendants] who must show by a preponderance of the evidence that there were other reasons for the adverse action and that the same adverse action would have resulted even if the plaintiff had not engaged in the protected activity at issue." <u>Leary</u>, 349 F.3d at 898. "These are issues of fact, however, and may not be decided on a motion for summary judgment unless the evidence 'is so one-sided that one party must prevail as a matter of law.'" <u>Boger v. Wayne County</u>, 950 F.2d 316, 322-23 (6th Cir. 1991).

a.      <u>Public Concern</u>

Plaintiff bases his 42 U.S.C. 1983 claims on four types of activity protected under the First Amendment: 1) his email that was used as a basis for his termination in 2003; 2) his "muckraking activities" from 2003; 3) the first lawsuit; and, 4) his September 2005 letter to "The Citizen."

Whittie requests the Court to find as a matter of law that his speech touched on a matter of public concern. He submits that even if his speech was "mixed" and involved both public and

private concerns, it is protected to the extent that the constitutionally protected portion led to his suspension and termination. However, Defendants contend that no protected speech underlies the instant dispute as Whittie's discipline was based on his violation of the police department's rules and regulations, rather than on his expressive activities.

Before engaging in any analysis, the Court notes that Plaintiff argues his actions in 2003 also contributed to his termination in 2005 after his letter to the editor was published in The Citizen. Federal Rule of Civil Procedure 42(a) permits a court to consolidate actions involving common questions of law or fact for the economy and convenience of the parties. The Court finds that because both Whittie's first suit and this suit primarily involve Whittie's claims that he was retaliated against for engaging in speech protected by the First Amendment, and that the speech which forms the basis for his first suit is also in question here, consolidation of both cases is proper for trial. However, because the Court has already found that Whittie's speech from 2003 was entitled to protection, the facts discussed below will only involve those for his claim that he was terminated, in part, for writing the letter to the editor of The Citizen.

The letter reads as follows:

I am writing to thank the neighbors on Yemans and Evaline streets near Lumpkin.

On one night last week, I had an occasion to respond to a drunk driving vehicle [sic] crash in the area that injured a teenager. After checking on the injured teenager, witnesses were quick to come forward and point out that the drunk suspect was fleeing on foot through an alley.

After I caught up to the suspect on foot, it was obvious that he was not going cooperate [sic] or submit to arrest. The suspect refused to follow all directions and began an all[-] out knock[-]down/drag-out fight that lasted several minutes. While my backup was racing to me during the struggle, several residents came out of the their backyards and into the alley to see what the commotion was. After observing that I was a police officer and was fighting to take a suspect into custody, several resident gentlemen were asking if I wanted their help. I yelled

14

out for people to stay away; this was so that no one would be hurt. I want to express my deep appreciation for the generous offer of help from each of you.

After the suspect was eventually taken into custody and transported by backup officers, I returned to the scene. I then learned that the witnesses to the crash were advising arriving Fire Department/EMS personnel to call for more police help as they observed I was in the alley fighting with the suspect.

I appreciate all of these witnesses and fire personnel relaying the call for help as well. At a time when a lot of people do not want to get involved, all of these witnesses were very cooperative and waited at the scene to give me any information they could for a successful prosecution.

This is just one example of how the police and the good people of our community can come together to take back our streets. It is positive police/community involvement such as this, that will only serve to better Hamtramck.

Defendants argue that Plaintiff's article was not legitimate news interest for general value and concern of the public at the time of its publication because it did not seek to inform the public of any inappropriate actions by City officials, and Plaintiff described it as merely a thank you letter. Thus, Defendants argue that it should not be considered protected speech.

Plaintiff, on the other hand, contends that the letter the letter served important educational ends because it informed readers of The Citizen of the need for officers to keep bystanders safe consistent with officers' duties as outlined in the City's Rules and Regulations, and highlighted how they did, and could, help to lead to a "better Hamtramck" by offering to help, calling for help, getting involved, cooperating, and waiting to give information to aid criminal prosecutions.

As the Sixth Circuit has recognized,

"[m]ixed questions of private and public concern, where the employee is speaking both as a citizen as well as an employee, can be protected." . . . . "Mixed speech" cases are the most difficult to adjudicate, "[b]ecause the employee admittedly speaks from multiple motives, [and] determining whether she speaks as a citizen or employee requires a precise and factually-sensitive determination." . . . . "[I]n

making this factual determination, we generally look to what was said, rather than
why it was said."

Banks v. Wolfe County Bd. of Educ., 330 F.3d 888, 894-95 (6th Cir. 2003) (citations omitted).
Therefore, merely because Whittie intended to thank the witnesses does not necessitate a finding
that the speech is purely personal.

Based on the fact that Whittie's letter involves an issue of police/community interaction
and cooperation, the Court finds that Whittie's speech is entitled to First Amendment protection
because it relates to matters of "political, social, or other concern to the community." Connick,
461 U.S. at 146. The record evidence indicates that the "content, form, and context" of Whittie's
speech, Connick, 461 U.S. at 146-47, involves "something that [was] a subject of legitimate
news interest; that [was], a subject of general interest and of value and concern to the public at
the time of publication." City of San Diego v. Roe, 543 U.S. 77, 84 (2004). Whittie's letter
sought "to develop informed opinions" by disclosing the reason behind his yelling for the
witnesses to stay back, and was intended to foster community and police cooperation. Therefore,
the information contained in his letter substantially concerned "issues about which information is
needed or appropriate to enable the members of society to make informed decisions about the
operation of their government." Brandenburg, 253 F.3d at 893. See also Solomon v. Royal Oak
Township, 842 F.2d 862, 865 (6th Cir. 1988).

In so finding, the Court recognizes that "the entirety of the employee's speech does not
have to address matters of public concern, so long as some portion of the speech touches on a
matter of public concern." Banks v. Wolfe County Bd. of Educ., 330 F.3d 888, 894 (6th Cir.
2003). "[T]he key question is not whether a person is speaking in his role as an employee or a
citizen, but whether the employee's speech in fact touches on a matter of public concern." Id.

As stated by the Supreme Court:

> Underlying the decision in Pickering is the recognition that public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public. Were they not able to speak on these matters, the community would be deprived of informed opinions on important public issues. The interest at stake is as much the public's interest in receiving informed opinions as it is the employee's own right to disseminate it.

City of San Diego, 543 U.S. at 82. Therefore, because a portion of the letter does in fact involve "something that [was] a subject of legitimate news interest; that [was], a subject of general interest and of value and concern to the public at the time of publication[,]" the speech falls within the concept of public concern. Roe, 543 U.S. at 84. Many citizens would have taken an interest in the police department's interaction with the community, and citizen cooperation with the police. Id., see also McMurphy v. City of Flushing, 802 F.2d 191, 196 (6th Cir. 1986) (noting that the public has a strong interested in the operation of a police department and efforts to give public exposure to expose misconduct).

b.     *Pickering* Balancing Test

Having found that Whittie's speech touched upon a matter of public concern, the Court must now determine whether his "interest in making such statements outweighs the interest of the City, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568. And because Whittie's speech "substantially involve[d] matters of public concern, . . . [D]efendants will have to make a stronger showing that their interests in regulating [his] speech outweighed [his] interest in speaking." Cockerel v. Shelby County Sch. Dist., 270 F.3d 1036, 1053 (6th Cir. 2001).

In striking the balance between the state's interest in conducting its affairs in a collegial manner and the employee's First Amendment rights, "courts should consider whether an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." Williams v. Commonwealth of Ky., 24 F.3d 1526, 1536 (6th Cir.1994). Stated another way, does the statement "impair[] discipline by superiors or harmony among co-workers, ha[ve] a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impede[] the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, 483 U.S. 378, 388 (1987).

Defendants raise a number of objections to Whittie's letter. First, the article was published within ten days of the police report on this incident while the criminal process was still pending. Defendants point out that Plaintiff would have likely been required to testify in that case, and therefore, inappropriately referred to the defendant in that criminal case as a drunk driver even though there was no Breathalyzer test at the scene and no blood test results at the time of the letter's publication. Relatedly, Defendants contend that Plaintiff disclosed details of the events which could be read by prospective jurors in the criminal case thereby prejudicing the jury pool.

In addition, Defendants maintain that Plaintiff provided characterizations of police operations which the Chief felt should be confidential. As Chief Doyle described, the Police Department does not want to sensationalize the fact that it occasionally has to use force. They also assert that Plaintiff's comment that fellow officers were "racing to me during the struggle"

18

was an inappropriate description of police officers' conduct. According to Defendants, the Police Department does not want citizens to have a concept that the police officers can race through their streets and that there are no procedures in place as to how the police would conduct themselves in traveling to the scene of an arrest.

Finally, Defendants read Plaintiff's letter as suggesting that the policy of the Police Department is that citizens should not assist officers in trouble. According to Chief Doyle, that is not the policy of the Police Department, nor does he want the criminal element to infer this is the department policy.

Whittie, however, contends that his actions were, in fact, sanctioned by the Police Department's Rules and Regulations. He cites page six of the Department's Rules and Regulations, which under the heading "Illustrative Example's of Work," state that part of a patrol officer's job is to "keep bystanders out of danger." Defs.' Ex. U, at pp. 6. He also argues that there is no basis, and Defendants have proffered no evidence to support, the belief that the Department's operations had actually been disrupted or could have been actually disrupted by the his use of the terms "knock down/drag out fight" or his reference to his backup "racing" to help him. He contends that people are aware that police officers must use force at times and must drive at speeds in excess of the posted speed limit at times to perform their duties.

Finally, he asserts that Defendants' argument that the unidentified drunk driving arrestee could have been prejudiced by the letter is based on imaginary concerns and is pretextual because the City has no general concern about such prejudice. To support this assertion, Plaintiff notes that the criminal defendant was not identified by name or otherwise in his letter. Moreover, Doyle admitted that the letter "certainly" was a less detailed description of events

than the Plaintiff's police report. Thus, he argues that there was no risk to the prosecution posed by the far less detailed version of facts in the letter.

He also cites the handling of Officer Ron Dupuis's termination in November 2005. According to Plaintiff, prior to Officer Dupuis's termination, information about his suspension for alleged criminal behavior was disseminated to local television stations at Doyle's behest. He also notes that the Department has routinely released sensitive information to the media in its crime log for years, including names of criminal defendants, descriptions of crimes, names of rape victims, names of those committed due to mental illness.

After examining Defendants' arguments, and the evidence presented, the Court finds that Whittie's "interest in making such statements outweighs the interest of the [City], as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568.

Based on the Department's own Rules and Regulations, part of a patrol officer's job is to keep bystanders out of danger. Therefore, Whittie's explanation for telling the witnesses to stay back while he was engaged with a suspect who was resisting arrest cannot be considered a meaningfully interference with the performance of his duties, or a contributing factor in the undermining of a legitimate goal or mission of the employer. See Williams, 24 F.3d at 1536. The letter clearly was not a blanket directive to stay away and not to get involved. Instead, it clearly encouraged citizen involvement and assistance, thanked citizens for their involvement and assistance, and noted important ways in which the citizens were involved and helped.

Moreover, given the facts that the Department releases a certain amount of information on all arrests in its crime log, and criminal charges about a identified criminal defendant were

released by the Department in the past, Defendants' contention that the type of information contained in Whittie's letter undermines due process or interferes with the judicial process, is at best, a hypothetical concern, and, at worst, a post-hoc rationalization for Whittie's termination.

Likewise, Chief Doyle's concerns that Whittie's letter sensationalizes the use of force, gives the impression that officers can race through their streets without governing procedures in place, and suggests that the policy of the Police Department is that citizens should not assist officers in trouble, is merely hypothetical. There is no basis to believe that the Department's operations had actually been disrupted or could have been actually disrupted by Plaintiff's use of the terms "knock down/drag out fight" or his reference to his backup "racing" to help him.

> Even accepting the proposition that a police department is a paramilitary organization built on relationships of trust and loyalty, and as such the judgment of police officials regarding the disruptive nature of an officer's speech is entitled to considerable - although by no means complete - deference, . . . [Defendants] offered no evidence . . . . that [Whittie's] speech had any disruptive effect on the department, nor is there evidence that, despite the absence of any actual disruption, [Defendants] reasonably believed it would have future disruptive consequences.

Gustafson v. Jones, 290 F.3d 895, 910 (7th Cir. 2002). Defendants have failed to produce evidence that the threat of those concerns in this case was so great as a result of Whittie's speech as to outweigh his First Amendment rights. Solomon, 842 F.2d at 866-67. Because Defendants have done little more than identify a hypothetical concern, they have failed to carry their burden "to make a particularly strong showing that [Whittie]'s speech interfered with workplace functioning." Leary, 228 F.3d at 737-38. Therefore, the facts viewed in the light most favorable to the plaintiff, show Defendants' "conduct violated a constitutional right." Saucier, 533 U.S. at 201.

### 2. Clearly Established Right

The second prong of the qualified immunity analysis requires the court to decide whether a reasonable official would, at the time the act was committed, understand that his conduct violated a clearly established right. <u>Saucier</u>, 533 U.S. at 201. A right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation that he confronted." <u>Id</u>., at 202. "[A] reasonable official would know that terminating an employee with the motivation, even in part, of quieting the plaintiff's public speech . . . violates the Constitution." <u>Hoover v. Radabaugh</u>, 307 F.3d 460, 469 (6th Cir. 2002). Therefore, viewing the facts in a light most favorable to Plaintiff, Defendants violated Plaintiff's clearly established right to engage in public speech, and qualified immunity for this claim is improper.

**V.      CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment on the basis of qualified immunity is **DENIED.  IT IS FURTHER ORDERED** that pursuant to FED. R. CIV. P. 42(a), which permits actions involving common questions of law or

fact to be consolidated for the economy and convenience of the parties, this matter is

consolidated for purposes of trial with <u>Whittie v. City of Hamtramck, et al.</u>, Case No. 03-60219.

**IT IS SO ORDERED.**

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

DATED: **July 3, 2007**

**CERTIFICATE OF SERVICE**

Copies of this Order were served upon counsel of record on this date by ordinary mail

and/or electronic filing.

s/Bernadette M. Thebolt
DEPUTY CLERK